IN THE UNITES STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF FLORIDA

TALLAHASSEE DIVISION

OCHEESEE CREAMERY, LLC,

  Plaintiff,

vs.      Case No:  4:14-CV-00621-RH-CAS

ADAM H. PUTNAM, in his
official capacity as Florida
Commissioner of Agriculture,
and GARY NEWTON, in his official
capacity as Chief of the Florida
Bureau of Dairy Industry,

  Defendants.

- - - - - - - - - - - - -/

DEPOSITION OF: LAURI WRIGHT, PHD, RDN

DATE:    May 11, 2015

TIME:    10:16 a.m. to 12:59 p.m.

PLACE:   Esquire Deposition Solutions
     101 East Kennedy Boulevard
     Suite 3350
     Tampa, Florida  33602

PURSUANT TO: Notice by counsel for
     Plaintiff for purposes
     of discovery, use at
     trial or such other
     purposes as are
     permitted under the
     Florida Rules of
     Civil Procedure

BEFORE:   REBECCA R. BERGER
     Notary Public - State
     of Florida

     Page 1-107



**EXHIBIT 5**

800.211.DEPO (3376)
EsquireSolutions.com

APPEARANCES:

        JUSTIN PEARSON, ESQ.
        Institute for Justice
        999 Brickell Avenue
        Suite 720
        Miami, Florida  33131
        (305) 721-1600
          Attorney for Plaintiff

        ASHLEY E. DAVIS, ESQ.
        DAVID GROSSMAN, ESQ.
        Office of the Attorney General
        PL-01, The Capitol
        Tallahassee, Florida  32399-1050
        (850) 414-3300
          Attorneys for Defendants


                    I N D E X

EXAMINATION BY MR. PEARSON                   Page 3

CERTIFICATE OF OATH                          Page 104

REPORTER'S CERTIFICATE                       Page 105

ERRATA PAGE                                  Page 106

                    EXHIBITS

| Plaintiff's | Description | Marked |
| --- | --- | --- |
| No. 1 | Report | 17 |
| No. 2 | FDA Regulations on Fortification | 21 |
| No. 3 | Interview Article | 33 |



Q.   Oh, I apologize.

A.   Yeah.

Q.   The final question, now, that one was 59 percent; right?

A.   Uh-huh.

Q.   The response rate.  Do you think that would have shifted if all of the consumers had been Whole Foods customers?

A.   I don't think so.

Q.   Why not?

A.   In my opinion, I believe that there was more of an issue with -- there was growing suspicion about why these questions were being asked, and so they -- I think they -- just overall, all of the participants, or many of the participants, started to grow -- I mean, trying to guess why you were asking these questions.

Q.   Right.

A.   So I believe that was the pla -- a result of the placement, not necessarily the demographics of those answering it.

Q.   So you think if you would have asked that question first, you would have re -- received different results?

A.   Yes.



Case 4:14-cv-00621-RH-CAS    Document 28-5    Filed 06/22/15    Page 4 of 94

LAURI WRIGHT, PH.D. RDN                                          May 11, 2015
OCHEESEE CREAMERY vs. PUTNAM                                              64

Q.   Do you know what those different results would have been?

A.   I can't know that because I didn't do it.

Q.   Right.

A.   I have an opinion.  I think they would have been higher, but I -- I have no way of knowing that because of the placement.

Q.   All right.  So it's possible it could have been lower?

A.   Possible.

Q.   Did you conduc -- or in terms of this survey, whether it was you or the -- the students, were any surveys conducted at farmer's markets?

A.   No.

Q.   Okay.  Why not?

A.   A typ -- farmer's markets in the Tampa Bay area don't typically sell milk.

Q.   For the second question, it says here that -- the second question was, quote, "Do you expect that the product labeled skim milk contained the same vitamin content as whole milk?" unquote.  Is that what was actually asked?

A.   Yes.

Q.   Okay.  Does that question take into account other information that could be on the



label?

A.   No.

Q.   Why not?

A.   I didn't have them, as part of it, review the label.

Q.   Do you agree that other information on the label could have impacted those results?

A.   If consumers would read the label, yes.

Q.   Yeah.

A.   But from professional experience, I can tell you, people don't read the label.

Q.   Okay.  But let -- let's say -- let's say you gave them a label that said this skim milk does not have the same vitamin content as whole milk --

A.   Uh-huh.

Q.   -- and then asked them, "Do you expect that this labeled skim milk would have the same vitamin content as whole milk?"  In that scenario, you would probably receive a different response than you did in the survey; right?

MS. DAVIS:  Objection.  That's compound and I ...

BY MR. PEARSON:

Q.   Well, did you understand what I'm trying to get at?



Q.   Did you do any analysis to compare any misunderstanding of Ocheesee Creamery's label with their misunderstanding of other types of food labels?

A.   No, I did not.  That wasn't the focus.

Q.   What was the focus?

A.   On the consumer -- what that -- I'm sorry. The -- the value and nutritional beliefs that consumers had about the skim milk and milk products, skim milk.

Q.   Sure.  So isn't it true that many consumers could be confused about a skim milk label and yet it would still be the same percentage of other types of milk labels?

MS. DAVIS:  Objection to form.

BY MR. PEARSON:

Q.   Do you understand what I'm saying?  Let -- let me rephrase.

Skim milk aside, Ocheesee Creamery aside, I'm just talking about milk labels generally; isn't it fair to say that sometimes consumers just don't understand what they're reading?

A.   I think that some consumers -- I think the bigger issue is not not understanding the labels.  I think the bigger confusion is when things are



Case 4:14-cv-00621-RH-CAS   Document 28-5   Filed 06/22/15   Page 7 of 94

LAURI WRIGHT, PH.D. RDN                                    May 11, 2015
OCHEESEE CREAMERY vs. PUTNAM                                        84

missing from labels or if they actually even read the labels.

Q.   True.  But have you ever warned anyone or had an interview where you talked about current labeling requirements that are misleading?

A.   In my opinion, labels have gotten a lot more consumer friendly.

Q.   Thank you, but that's not what I asked, Doctor.  Are -- have you ever, in -- in your experience, talked about problems with current required labels?

A.   I will teach about how to use the tools of the foo -- of the -- of the label, but I don't -- I belie -- I believe in teaching them about the -- using it as a tool and making decisions.

Q.   Sure.  So, for example, would one of the things you teach be the -- the idea that on a -- a nutrition label, you have to look at how many servings are included in each container?

A.   Correct.

Q.   And sometimes consumers get confused and don't realize you need to multiply by two or three, or whatever it may be?

A.   But I see that as a -- a teaching tool versus a deception.



A.   I don't know of any documented cases of a vitamin A allergy.  Actually, no.  It's a vital nutrient.  You can't -- you --

Q.   I'm just --

A.   -- can't --

Q.   -- asking.

A.   You can't -- it's an essential nutrient. You can't be allergic to that.

Q.   Are you aware of the term "probability sample"?

A.   Yes.

Q.   And -- and what does that mean?

A.   Probability is the likelihood of an event occurring.

Q.   Okay.  Would you characterize this survey as a probability sample?

A.   No.

Q.   Why not?

A.   Because it was not designed that way.  It was simply a survey of beliefs and attitudes. Probability looks more at potential cause and effect so your design has to be very different.

Q.   And how would it have to be different?

A.   You would study more actions, like watching purchasing behaviors, getting ex -- very

in-depth information on each individual and looking at correlations between certain characteristics and their actual behavior.

Q.   When researchers take a sample size of a survey and extrapolate out to the general population, isn't that normally done using a probability survey?

A.   There's many ways that you extrapolate your findings to the -- the survey -- I mean, to the -- to -- that you generalize to the population based on the sample.

MS. DAVIS:  Please remember to first verbalize your answer.

THE WITNESS:  Oh.

MS. DAVIS:  You're doing a few head nods.

MR. PEARSON:  Sure.

BY MR. PEARSON:

Q.   Did your -- we talked about earlier people have different reasons, and sometimes multiple reasons at the same time, for -- for purchasing milk; right?

A.   That's correct.

Q.   Did your survey seek to find out which reasons consumers value the most?

A.   No, it did not.



Case 4:14-cv-00621-RH-CAS    Document 28-5    Filed 06/22/15    Page 10 of 94

LAURI WRIGHT, PH.D. RDN                                    May 11, 2015
OCHEESEE CREAMERY vs. PUTNAM                                         96

Q.   Did it compare any reason to any other reason --

A.   No.

Q.   -- in terms of the -- the impact of the purchasing decision?

A.   No, it did not.

Q.   Okay.  Now, were you attempting to measure whether a consumer would be confused by Ocheesee Creamery's skim milk label?

A.   Say -- repeat the question.

Q.   Sure.  With your survey --

A.   Uh-huh.

Q.   -- were you attempting to measure whether consumers would be confused by Ocheesee Creamery's skim milk label?

A.   No, I was not trying to measure their confusion or -- I was simply asking for their opinion of the product, the label.

Q.   So were you attempting -- and I -- I don't just necessarily mean measurement.  But just so I'm clear, were you attempting to find out with your survey whether any consumers would be confused by Ocheesee Creamery's skim milk label?

A.   I was measuring what their assumptions were about the product based on the label.



Case 4:14-cv-00621-RH-CAS    Document 28-5    Filed 06/22/15    Page 11 of 94

LAURI WRIGHT, PH.D. RDN                                          May 11, 2015
OCHEESEE CREAMERY vs. PUTNAM                                              104

CERTIFICATE OF OATH

STATE OF FLORIDA

COUNTY OF HILLSBOROUGH

     I, the undersigned authority, certify that LAURI WRIGHT, PHD, RDN personally appeared before me and was duly sworn.

     WITNESS my hand and official seal this 11th day of May, 2015.

_____
REBECCA R. BERGER

Notary Public - State of Florida

My Commission Expires:  10/3/2018

Commission No.:  FF134536



Case 4:14-cv-00621-RH-CAS    Document 28-5    Filed 06/22/15    Page 12 of 94

LAURI WRIGHT, PH.D. RDN                                    May 11, 2015
OCHEESEE CREAMERY vs. PUTNAM                                        105

REPORTER'S CERTIFICATE

STATE OF FLORIDA

COUNTY OF HILLSBOROUGH

     I, Rebecca R. Berger, certify that I was authorized to and did stenographically report the deposition of LAURI WRIGHT, PHD, RDN, that a review of the transcript was requested, and that the transcript is a true and complete record of my stenographic notes.

     I further certify that I am not a relative, employee, attorney, or counsel of the parties, nor am I a relative or employee of any of the parties' attorney or counsel connected with the action, nor am I financially interested in the outcome of the foregoing action.

     Dated this 11th day of May, 2015, IN THE CITY OF TAMPA, COUNTY OF HILLSBOROUGH, STATE OF FLORIDA.

_____
REBECCA R. BERGER



1

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF FLORIDA
Tallahassee Division

```
---------------------------------:
OCHEESEE CREAMERY, LLC,            :
                                   :
              Plaintiff,           :
                                   :
         vs.                       :Case No.
                                   :
ADAM H. PUTNAM, in his official    :4:14CV00621-RH-CAS
capacity as Florida Commissioner   :
of Agriculture; and GARY NEWTON,   :
in his official capacity as        :
Chief of the Florida Bureau of     :
Dairy Industry,                    :
                                   :
              Defendants.          :
---------------------------------:
```

Arlington, Virginia

Friday, May 8, 2015

Deposition of:

BAYLEN JAMIE LINNEKIN,

called for oral examination by counsel for

Defendants, pursuant to notice, at the office of

Institute for Justice, 901 North Glebe Road, Suite

900, Arlington, Virginia, before BLAIRE G. BENEFIELD,

FPR, of Capital Reporting Company, a Notary Public in

and for the District of Columbia, beginning at 9:11

a.m., when were present on behalf of the respective

parties:

2

A P P E A R A N C E S

On behalf of Plaintiff:
        JUSTIN PEARSON, ESQUIRE
        Managing Attorney - Florida Office
        Institute for Justice
        999 Brickell Avenue
        Suite 720
        Miami, Florida 33131
        (305) 721-1600
        Jpearson@ij.org

On behalf of Defendants:
        JON A. GLOGAU, ESQUIRE
        Chief, Complex Litigation
        ASHLEY E. DAVIS, ESQUIRE
        Assistant Attorney General
        Office of the Attorney General
        PL-01, The Capitol
        Tallahassee, Florida 32399
        (850) 414-3300
        Jon.glogau@myfloridalegal.com
        Ashley.davis@myfloridalegal.com

                    *   *   *   *   *

Capital Reporting Company
Linnekin, Baylen Jamie 05-08-2015

3

C O N T E N T S

EXAMINATION BY:                                    PAGE

   Counsel for Defendants                            4


            E X H I B I T S

LINNEKIN DEPOSITION EXHIBITS: *              PAGE

1 Expert Report of Baylen J. Linnekin            6

(* Exhibits attached to transcript.)

Capital Reporting Company
Linnekin, Baylen Jamie 05-08-2015

23

vegans and vegetarians.

And then, at this other one, they're mortal enemies, you know, people who are -- and I'll do finger quotes again here -- mistreating animals. So it was, you know, foie gras at one and I hate foie gras at the other. And so I've -- so that's what I mean, I guess, when I say that both my experience and then the people that I talk to is sort of broad and deep. I think I'm welcome in both places, which I think is unusual, and I get to speak with people whose opinions are all over the spectrum.

Q    We're going to dig into your report pretty soon, but I wanted --

A    Sure.

Q    -- to kind of wrap up this discussion about your expertise.

A    Uh-huh.

Q    Have you ever studied the reasonable expectations of consumers when shopping for their groceries?

A    Yeah. I mean, I've certainly read, just

Capital Reporting Company
Linnekin, Baylen Jamie 05-08-2015

24

as part of my general research and habits, various studies -- some of which I agree with; some of which I don't -- on consumer behavior.

Q    But have you ever conducted any studies?

A    No.

Q    Okay.  All right.  Let's move on to the substance of your report.  Just explain for me generally exactly what you did to prepare your report.

A    Sure.  I certainly looked at all of the available documents that I had, so the state's filings, various affidavits, and other, you know, filings in the case.  I conducted my own research, which I think I cite throughout the report as well, and looked at, I think, somewhat wholistically the regulations and how they work and impact consumer behavior in this case, and, you know, how the labelling works to impact consumers in their decision-making.

Q    Did you yourself conduct any consumer surveys or studies to determine what consumers think about the labels you opine about in this

Capital Reporting Company
Linnekin, Baylen Jamie 05-08-2015

25

report?

A    No, I didn't.

Q    Okay.  Did you conduct any consumer surveys or studies during the process of preparing your report?

A    No, I didn't.

Q    Throughout your report you seem to rely on affidavits that are provided in this case; is that correct?

A    In part, I certainly rely on the affidavits.  You know, they, I think, helped paint a broader picture, I guess.

Q    Did you talk to any of those affiants?

A    No, I didn't.

Q    So when you're relying upon the affidavits in this case, are you just relying upon what is written in the affidavits?

A    To the extent that I relied on affidavits, which, again, I said was not -- you know, formed part of the basis of my report, then, yes, I had no other contact with the five or so people who filed the affidavits.

34

refers to the fact that 40 percent of our food is essentially thrown out in the garbage, which is an environmental issue, amongst other problems.  And materials pertaining to food waste that I read, I guess, in the course of reading about skim milk, I learned that skim milk had, in fact, been typically thrown out and gone to waste and contributed to food waste.  But at some point, I guess, hundreds of years ago, people realized that you could feed it to people and animals and whatnot.

Q   I think I recall you citing "The Wealth of Nations."  There was a -- did you cite "The Wealth of Nations" somewhere in your expert report?

A   Actually it's on page 8 here at the bottom, yes.

Q   Well, look at that.  What was Adam Smith talking about in the passage that you're relying upon about skim milk?

A   Well, he was -- yeah, I note here he noted the usefulness of the farmer to -- to a

Capital Reporting Company
Linnekin, Baylen Jamie 05-08-2015

53

are representative of reasonable consumers generally; is that correct?

A   They are part of the representation of reasonable consumers as a whole, yes.

Q   Okay.  If I were going to do a study on reasonable consumers generally and their perceptions about a particular food label, would it be okay to just rely upon those five affiants?

A   No.  You would want to have a very broad set of individuals that would and should include people such as the five people who filed these affidavits.

Q   Okay.  Is it important for a food label to accurately reflect the food that is inside the package or container?

A   Yes, absolutely.

Q   Why?

A   Because fraud, adulteration, things like that are important for Government to prevent.

Q   Okay.  Are those some of the things that the standards of identity are meant to protect against?

Capital Reporting Company
Linnekin, Baylen Jamie 05-08-2015

65

wholistic approach.  I think they look at the whole label, particularly the front of the label.

Q    What basis do you have for that conclusion?

A    I guess you asked for my opinion.  I mean, I think that generally in marketing and advertising, research that I've looked at over the years, the front of a food label is where consumers' eyes tend to go first and mostly.

Q    Okay.  Does the reasonable consumer -- let's back up for one minute.

A    Sure.

Q    Does the reasonable consumer know what skim milk is?

A    Yes, I think that they do.

Q    What does the reasonable consumer think that skim milk is?

A    I think it comports with the dictionary definition.

Q    Do you think most -- do you think reasonable consumers know what skim milk is because they looked it up in the dictionary?

Capital Reporting Company
Linnekin, Baylen Jamie 05-08-2015

66

A    No.  I think it's one of those words like "walking" which we all understand even if we don't look it up in the dictionary.

Q    Okay.  How --

A    I think that -- I guess the affidavits, for example, comport with the dictionary definition, even though I suspect that the affiants didn't, you know, pull out their Webster's to come up with their definitions.

Q    Are you relying upon anything other than the affidavits to come to the conclusion that most consumers know skim milk to be what the dictionary says it is?

A    I mean, I think that in various citations here I refer to skim milk, including the dictionary definitions, and so I think that -- and that's over the course of, I think, at least 250 years or so that the definition has remained constant.  I think that's...

Q    Can you point to any particular study of consumer perceptions of what skim milk is that determine what they think it is?

Capital Reporting Company
Linnekin, Baylen Jamie 05-08-2015

67

A    I don't know that I cited anything, necessarily.  I note -- well, I guess --

Q    Do you know of any studies or consumer surveys that attempt to determine what a consumer thinks skim milk is?

A    No.  And I think I cite to an FTA document -- did I? -- that talks about how research is incomplete and they would like to know more or something like that.

Q    Okay.  Do reasonable consumers know that substantially all vitamins in milk are removed during the skimming process?

MR. PEARSON:  Objection to form.

THE WITNESS:  I think that, actually, it's not the case that substantially all vitamins are removed.  For example, B vitamins are present in higher levels in skim milk.

BY MS. DAVIS:

Q    What about the fat soluble vitamins?  Are substantially all of the fat soluble vitamins in whole milk removed during the skimming process?

A    Yes.

Capital Reporting Company
Linnekin, Baylen Jamie 05-08-2015

68

Q    Okay.  Do reasonable consumers know that substantially all the fat soluble vitamins are removed during the skimming process?

A    I think they do.

Q    Why do you think that?

A    Certainly the affiants discuss that they're -- that they know things along those lines, and I was aware of it, and I think others as well.

Q    But do you have any other basis other than just your awareness and the affiants' awareness of that fact to conclude that reasonable consumers know that substantially all are removed?

A    I did not conduct a study or a survey or anything like that.

Q    Do you know of any study?

A    I am not aware of any study.  I did read the expert report prepared by your expert, so...

Q    Okay.  So you're basing your conclusion that reasonable consumers know that substantially all the fat soluble vitamins are removed during the skimming process because of the affidavits and

69

your understanding; is that correct?

MR. PEARSON:  Objection to form.

THE WITNESS:  And based on conversations with others.

BY MS. DAVIS:

Q    Conversations with who?

A    With other food lawyers about their general perceptions.

Q    Do food lawyers have a better sense of what food is made of than the rest of the population?

A    In some cases, they do, yes.

MS. DAVIS:  Let's take a break.

(A recess was held from 10:27 a.m. until 10:36 a.m.)

MS. DAVIS:  Back on the record.

BY MS. DAVIS:

Q    Do consumers' expectations of milk include its nutritional content?

A    Sort of broadly or about --

Q    Broadly.

A    -- specifics?

Capital Reporting Company
Linnekin, Baylen Jamie 05-08-2015

70

MR. PEARSON:  And objection to form.

THE WITNESS:  I would say that consumers that buy milk, some of them buy it for its nutritional qualities.

BY MS. DAVIS:

Q    Just some consumers?

MR. PEARSON:  Objection to form.

THE WITNESS:  Yeah, I think that's safe to say, yes.

BY MS. DAVIS:

Q    What are the other reasons a consumer would buy milk?

A    They like the taste of it.  Your expert report notes that some people like to put it on their cereal.  You know, there's people who want to add it to their coffee.

Q    Are there any studies that you know of that indicate what consumers expect their milk to contain in terms of the nutritional content?

A    Am I aware of any studies?

Q    Yes.

A    I'm not aware of any studies, per se.  I

71

do think that -- well, I'll end it there.

Q    So what's your basis for the conclusion that only some consumers have expectations that their milk has a particular nutritional content?

A    I mean, I think, again, reasonable consumers buy products for a variety of reasons. People might buy steak -- let's take it out of milk -- because they know that it's nutritious in a variety of ways, or they might buy it because they like the taste or because it makes them feel manly or who knows.  I mean, there are infinite reasons why people might buy a product.

MR. PEARSON:  Do you guys want to take a break so you can talk?

MR. GLOGAU:  No, no.  We're okay.

MS. DAVIS:  No.

BY MS. DAVIS:

Q    Let's step away from why consumers buy milk and focus in on consumers' expectations of what is in their milk.

A    Okay.

Q    So aside from the reasons why you would

Capital Reporting Company
Linnekin, Baylen Jamie 05-08-2015

82

A    So, yes, in part I rely on the history.

Q    Are consumers aware of the history of skim milk?

A    They may or may not be.

Q    Okay.  So how does that history support your conclusion that consumers won't be mislead by the label because of the history of skim milk?

A    If I can analogize, I guess, if a boat has been defined as a wooden object that floats on an ocean and was later updated to say some metal craft, people understand generally what a boat is. And if that definition has remained consistent throughout history, then I think it's safe to say that reasonable people would understand the definition.

Q    Aside from the history, the sworn statements of Ocheesee's customers, and the beliefs and expectations of reasonable consumers, have you done anything else to reach the conclusion that consumers would not be misled by Ocheesee's label?

A    I guess, what do you mean by "done"?

83

Q    Have you conducted any surveys or consumer studies about consumer expectations of what pasteurized skim milk is?

A    No.

Q    Okay.  Is it your conclusion that Ocheesee's consumers specifically and the reasonable consumers generally would be misled by the label "Non-Grade A milk product, natural vitamins removed"?

A    Absolutely.

Q    Well, what is the basis for that conclusion?

A    The definition -- the term does not convey what actually is in the container.

Q    How does it not accurately convey that information?

A    I think I discussed in my report.  For example, consumers buy skim milk for -- one reason because it has had the fat removed.  It's skim, it's fat-free.

There is no reference in that term definition that Florida suggests that refers at

110

CERTIFICATE OF NOTARY PUBLIC

I, BLAIRE G. BENEFIELD, FPR, the officer before whom the foregoing deposition was taken, do hereby certify that the witness whose testimony appears in the foregoing deposition was duly sworn by me; that the testimony of said witness was taken by me in stenotypy and thereafter reduced to typewriting under my direction; that said deposition is a true record of the testimony given by said witness; that I am neither counsel for, related to, nor employed by any of the parties to the action in which this deposition was taken; and, further, that I am not a relative or employee of any counsel or attorney employed by the parties hereto, nor financially or otherwise interested in the outcome of this action.

_____
BLAIRE G. BENEFIELD
Notary Public in and for the
Commonwealth of Virginia

My commission expires:
January 31, 2016
Notary Registration No.:  7530333

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF FLORIDA
Tallahassee Division

OCHEESEE CREAMERY, LLC

      Plaintiff,

-vs-                          CASE NO.:4:14-cv-00621-RH-CAS

ADAM H. PUTNAM, in his official
capacity as Florida Commissioner of
Agriculture; and
GARY NEWTON, in his official
capacity as Chief of the Florida
Bureau of Dairy Industry.

      Defendants.
_____/

## **DEPOSITION OF CHUCK PARKER**

Reported by Elaine Richbourg, a Court Reporter

and Notary Public, State of Florida at Large, take

at 2049 West County Road 30A, Santa Rosa Beach,

Florida, on Thursday, April 30th, 2015, commencing

at approximately 2:15 P.m. CST.

### *ELAINE RICHBOURG*
**COURT REPORTER**
**2320 Brightview Place**
**Cantonment, Florida 32533**
**(850) 968-6465**
**elainerichbourg@cox.net**

2

**APPEARANCES**

For the Plaintiff:

JUSTIN PEARSON, ESQUIRE
Institute for Justice
999 Brickell Avenue, Ste. 720
Miami, FL  33131

For the Defendants:

ASHLEY E. DAVIS, ESQUIRE
DAVID S. GROSSMAN, ESQUIRE
Office of the Attorney General
PL-01, The Capitol
Tallahassee, FL  32399-1050

COURT REPORTER:
ELAINE RICHBOURG

purchase milk for?

A    I'm not sure I understand what you're asking me.  Milk is milk.

Q    What nutrition do you get from milk?

A    What nutrition do you get from milk?

Q    Uh-huh.

A    Obviously, you get whatever nutritional value is in the milk.  You know, I haven't gone and looked at the chemical breakdown of milk.  But my wife, who happens to the food police, the queen the organic food and natural food, tells me that the best milk we can buy is raw milk, okay.

Q    Okay.  What do you expect to be the nutritional content of milk?

A    I'm not sure I understand -- when you're saying -- do you want me to break down the vitamins is milk, is that what you're asking me?

Q    Sure.  What vitamins are in milk?

A    I have no idea.

Q    Okay.  Fair enough.

A    Okay.

Q    Did you sign an affidavit in this case?

A    I did.

Q    I'm going to hand you what has been marked as Exhibit 4.

13

Q    Okay.  Where did you purchase Ocheesee's skim milk?

A    Seaside Farmers Market on Saturday mornings.

Q    Have you ever -- had you ever purchased Ocheesee's skim milk anywhere other than Seaside's Farmers Market?

A    No, ma'am.

Q    What other Ocheesee products have you purchased?

A    Oh, gosh, cream, butter, cheese, milk, chocolate milk.  My grandchildren love the chocolate milk.  Have you got that?

Q    When you say that you bought Ocheesee milk, are you referring to raw milk?

A    I am.

Q    Okay.  Have you ever bought Ocheesee whole milk?

A    You know, I don't think so.  Isn't that funny.  I never thought about that, but I don't think so.  My wife is usually with me so she insists on the raw milk.

Q    Now, when you were purchasing Ocheesee's skim milk, did you purchase the skim milk that you were purchasing?

A    Yeah, not a whole lot.  A little bit.  She usually got it for cooking.  Don't ask me to go into that.  I don't understand why you do the skim milk, but she used it some type of cooking process.

Q    But you didn't particularly drink Ocheesee's skim milk?

A    Occasionally, I'd drink it a little bit but it wasn't anything.  I'd rather have the raw milk.

Q    Okay.

A    Okay.

Q    So you would only drink Ocheesee skim milk on occasion; is that correct?

A    Correct.

Q    Would you drink a glass of it or did you use it some other way?

A    I would drink a glass of it.

Q    During the time that you were purchasing Ocheesee skim milk, were you consuming more of Ocheesee's raw milk than you were the skim milk?

A    Absolutely.

Q    Are you still purchasing and consuming Ocheesee raw milk?

A    I am.  Three gallons a week, between the wife and I.

cooking procedure that she was doing.  You'll have to go ask her.  You can depose her.  I would love to be there when you do it.  I want to ask a few questions.  No, I'm sorry.  I digress.

Q    So the reason that you bought Ocheesee's skim milk was for your wife's cooking; is that correct?

A    Basically.

Q    Were there any other reasons?

A    You know, I don't remember it because -- it was on her shopping list and I just bought it.  I don't know what else she may have used it for.  I can't imagine she used it for anything other than baking or cooking or whatever she was doing. Whatever it called for.

Q    And would you consume Ocheesee's skim milk just because it was in the fridge or for another reason?

A    Probably because I ran out of raw.

Q    Okay.  What is skim milk?

A    Well, it happens to be whole milk with the cream removed.  That's why they skim the cream off the top and that's why it's called skim milk, is my understanding.  My mother told me that, by the way.

Q    Let's get into that.  How long have you

**<u>CERTIFICATE OF OATH</u>**

STATE OF FLORIDA

COUNTY OF ESCAMBIA

I, the undersigned authority, certify that CHUCK PARKER personally appeared before me and was duly sworn.

WITNESS my hand and official seal this 8th  day of May, 2015.

ELAINE RICHBOURG

ELAINE RICHBOURG
MY COMMISSION # EE146436
EXPIRES March 06, 2016
(407) 398-0153    FloridaNotaryService.com

## REPORTER'S DEPOSITION CERTIFICATE

I, ELAINE RICHBOURG, Court Reporter, certify that I was authorized to and did stenographically report the foregoing deposition of CHUCK PARKER; and that a review of the transcript was requested; and that the transcript is a true and complete record of my stenographic notes.

I further certify that I am not a relative, employee, attorney, or counsel of any of the parties, attorney or counsel connected with the action, nor am I financially interested in the action.

Dated this 8th day of May, 2015.

_____
ELAINE RICHBOURG, COURT REPORTER

ELAINE RICHBOURG
MY COMMISSION # EE146436
EXPIRES March 06, 2016
(407) 398-0153    FloridaNotaryService.com

              IN THE UNITED STATES DISTRICT COURT
           FOR THE NORTHERN DISTRICT OF FLORIDA
                  Tallahassee Division


OCHEESEE CREAMERY, LLC

        Plaintiff,

-vs-                         CASE NO.:4:14-cv-00621-RH-CAS

ADAM H. PUTNAM, in his official
capacity as Florida Commissioner of
Agriculture; and
GARY NEWTON, in his official
capacity as Chief of the Florida
Bureau of Dairy Industry.

        Defendants.
_____/



          **DEPOSITION OF BERT SUMMERVILLE**



     Reported by Elaine Richbourg, a Court Reporter

and Notary Public, State of Florida at Large, take

at 2049 West County Road 30A, Santa Rosa Beach,

Florida, on Thursday, April 30th, 2015, commencing

at approximately 1:00 p.m. CST.



# *ELAINE RICHBOURG*
**COURT REPORTER**
**2320 Brightview Place**
**Cantonment, Florida 32533**
**(850) 968-6465**
**elainerichbourg@cox.net**

2

**<u>APPEARANCES</u>**

For the Plaintiff:

          JUSTIN PEARSON, ESQUIRE
          Institute for Justice
          999 Brickell Avenue, Ste. 720
          Miami, FL  33131

For the Defendants:

          ASHLEY E. DAVIS, ESQUIRE
          DAVID S. GROSSMAN, ESQUIRE
          Office of the Attorney General
          PL-01, The Capitol
          Tallahassee, FL  32399-1050

COURT REPORTER:
    ELAINE RICHBOURG

A    No.

Q    Where did you purchase Ocheesee chocolate milk?

A    At Seaside Farmers Market.

Q    Did you purchase all of your Ocheesee products at the Seaside Farmers market?

A    Yes.

Q    And you've never purchased the items anywhere else?

A    No.

Q    Okay.  Why did you begin purchasing Ocheesee skim milk?

A    I purchase Ocheesee -- I liked their milk products because I like the way the milk tastes. And my husband has -- he said he does not like the thick milk, which is the whole milk, so I purchased the skim milk for him.

Q    Did you purchase Ocheesee skim milk for any personal reasons?

A    Other than the taste and it was the other -- the whole milk was too rich, I guess, is probably what the best terminology is that my husband said.

Q    Okay.  Any other reasons that you purchased Ocheesee skim milk?

A    No, I don't think so.

that skim milk means it is not whole milk, it is not as rich as whole milk.

Q    Okay.  Thank you.  I appreciate that.  How did you arrive at the conclusion that skim milk is -- isn't as rich as whole milk, as you've described it?

A    Well, it doesn't taste the same.

Q    Okay.  Did someone tell you that that's what skim milk is?

A    I don't think so.  I think that I've just assumed that skim milk is not as rich as whole milk and it doesn't have as much fat content.  That's what I have always assumed.

Q    Okay.  Have you ever read somewhere what skim milk is?

A    No, I don't think so.

Q    Okay.

A    I've never done a lot of history on milk.

Q    So, you've come to the conclusion that skim milk is what you've described it to be, just based on an assumption?

A    Yes.

Q    And you've had that assumption forever?

A    Yes.

Q    All right.  Does skim milk have less

vitamins than whole milk?

A   I have no idea.

Q   Okay.  Let's take a look at paragraph 4 of Exhibit 3, paragraph 4 of your affidavit.  If you could, just review that paragraph and let me know when you've reviewed it.

A   So by paragraph 4, it's number 4?

Q   Correct.

A   Okay.

Q   In paragraph 4, you state that after Ocheesee Creamery stopped selling pasteurized skim milk, it became more difficult for me to purchase pasteurized skim milk without additives?

A   Yes.

Q   Did you read that correctly?

A   Correct.

Q   And is that a true and accurate statement?

A   Yes.  Because all of the skim milk in the grocery stores are all sorts of additives.

Q   What do you mean when you say additives?

A   Well, I think probably, and I don't really know, because I haven't read exactly what is in there, but they have things in it that I know that Ocheesee did not have in it, because Ocheesee didn't put additives in their milks.

A    Yes.

Q    And you would purchase that once or twice a month?

A    Yes.  Because my husband was the only one who would drink it.  I mean, I would drink it at times, but he was the one who really liked to drink it.  So I did not have a lot of it.  We would not buy a large portion of it.

Q    Did your husband drink most of the Ocheesee skim milk?

A    He drank most of it, yes.

Q    Would you purchase Ocheesee's skim milk if it had vitamins added back?

A    I don't know.  I don't know.

Q    I think, and correct me if I'm wrong, you seem to be not against additives in food if they're natural and you want them at the time; is that correct?

A    Yes.

Q    So it's more about additives being natural or not; is that correct or --

A    No, no.  I think -- I think what it boils down to is if I want to purchase something that somebody provides, and it is not harming me, then I think I have right to purchase that.

is.

Q    Okay.

A    And, of course, when I say anything to him, he rolls his eyes and he says, I'm crazy. So --

Q    Have you consumed any skim milk since Ocheesee stopped selling its skim milk?

A    I have not, no.

Q    Why haven't you purchased or consumed skim milk since Ocheesee's product has stopped been being sold?

A    Well, A, my husband is the one who drinks it mostly, and I like the taste of whole milk.  So I buy whole milk from Ocheesee and I drink their whole milk --

Q    Okay.

A    -- and their chocolate milk.

Q    When you were purchasing and yourself consuming Ocheesee's skim milk, were you, at that time, also relying more on Ocheesee's whole milk and chocolate milk than you were their skim milk?

A    I was personally, yes.

Q    And currently you drink whole milk, Ocheesee's whole milk and Ocheesee's chocolate milk; is that correct?

**CERTIFICATE OF OATH**

STATE OF FLORIDA

COUNTY OF ESCAMBIA

I, the undersigned authority, certify that BERT SUMMERVILLE personally appeared before me and was duly sworn.

WITNESS my hand and official seal this 8th day of May, 2015.

ELAINE RICHBOURG

**ELAINE RICHBOURG**
MY COMMISSION # EE146436
EXPIRES March 06, 2016
(407) 398-0153     FloridaNotaryService.com

52

## REPORTER'S DEPOSITION CERTIFICATE

I, ELAINE RICHBOURG, Court Reporter, certify that I was authorized to and did stenographically report the foregoing deposition of BERT SUMMERVILLE; and that a review of the transcript was requested; and that the transcript is a true and complete record of my stenographic notes.

I further certify that I am not a relative, employee, attorney, or counsel of any of the parties, attorney or counsel connected with the action, nor am I financially interested in the action.

Dated this 8th day of May, 2015.

_____

ELAINE RICHBOURG, COURT REPORTER.

ELAINE RICHBOURG
MY COMMISSION # EE146436
EXPIRES March 06, 2016
(407) 398-0153    FloridaNotaryService.com

```
              IN THE UNITED STATES DISTRICT COURT
             FOR THE NORTHERN DISTRICT OF FLORIDA
                    Tallahassee Division



OCHEESEE CREAMERY, LLC

          Plaintiff,

-vs-                        CASE NO.:4:14-cv-00621-RH-CAS

ADAM H. PUTNAM, in his official
capacity as Florida Commissioner of
Agriculture; and
GARY NEWTON, in his official
capacity as Chief of the Florida
Bureau of Dairy Industry.

          Defendants.
_____/
```

### DEPOSITION OF SHARON SCHAEFER

Reported by Elaine Richbourg, a Court Reporter

and Notary Public, State of Florida at Large, taken

at 2049 West County Road 30A, Santa Rosa Beach,

Florida, on Thursday, April 30th, 2015, commencing

at approximately 9:30 a.m. CST.

## ELAINE RICHBOURG
### COURT REPORTER
**2320 Brightview Place**
**Cantonment, Florida 32533**
**(850) 968-6465**
**elainerichbourg@cox.net**

2

**APPEARANCES**

For the Plaintiff:

JUSTIN PEARSON, ESQUIRE
Institute for Justice
999 Brickell Avenue, Ste. 720
Miami, FL  33131

For the Defendants:

ASHLEY E. DAVIS, ESQUIRE
DAVID S. GROSSMAN, ESQUIRE
Office of the Attorney General
PL-01, The Capitol
Tallahassee, FL  32399-1050

COURT REPORTER:
ELAINE RICHBOURG

A    At the market, the Farmers Market.

Q    At the Farmers Market?

A    Uh-huh.

Q    Did you ever buy Ocheesee skim milk anywhere other than the Farmers Market?

A    No.

Q    Have you ever purchased other Ocheesee products?

A    Yes.

Q    What products have you purchased?

A    The whole milk, the chocolate milk, the ice cream, the cheeses, the cottage cheese, what do you call it, yogurt.

Q    Okay.

A    I should say, not the whole milk, the raw milk.

Q    So not the whole milk?

A    Right.  It would be the raw milk.

Q    Raw milk?

A    Uh-huh.  And the butter.  And the cream.

Q    That's quite the shopping basket.  Have you always bought these products at the Farmers Market?

A    Yes.

Q    So you've never bought any Ocheesee

case?

A    Probably.  I don't know.

Q    You just can't recall?

A    No.

Q    Okay.  Perhaps it was just as you mentioned, just common sense to you, growing up on a farm?

A    Uh-huh.

Q    Is that accurate?

A    Yes.

Q    Thank you.  I think I'm going to get in the habit of throwing in a few uh-huh's and huh-uh's, as well, so I thank you for that.  What, specifically, what vitamins are in the cream of milk?

A    I don't know.

Q    You don't know?

A    No.

Q    You just know that the vitamins that are commonly contained in what we know of as milk are contained in the cream, rather than in the other part of the milk?

A    Not necessarily.

Q    Okay.

A    I think, you know, the -- I know the milk,

24

as far as skim milk, is going to have vitamins and minerals in it, just like the cream.  But I would think the cream -- cream may have more, just because it is so rich.

Q   But you're not aware specifically of what vitamins are in the cream?

A   No, I'm not.

Q   And are you aware of what vitamins, specifically, are in the other portion of milk, other than the cream?

A   No.

Q   Okay.  Are you aware at all that the law requires, and Mr. Pearson will disagree with me, but the vitamins skimmed off need to be added back to the milk in order to be sold as skim milk?

MR. PEARSON:  Objection to form.

A   (By the Witness)  You're asking if I'm aware that it needs to be replaced?

Q   (By Ms. Davis) Correct.  Are you aware that the law requires the vitamins skimmed off --

A   No, I didn't realize there was a law like that, but it doesn't make sense to me either.

Q   That's fair enough.

A   Okay.

Q   That's fair enough.  Do you know what

be a truck and -- and --

Q    But what is it generally a picture of?

A    A cow.  A cow.

Q    Is this a -- is this a picture of what Ocheesee's skim milk bottle looked like?

A    Yes.

Q    Okay.  Is it also what the raw milk looks like or was there a difference?

A    The raw milk has on the label it says -- what does it say, something pet milk.

Q    It says pet milk?

A    Yes.

Q    Okay.  What does that mean?

A    It means whoever said that they have to put that on there, doesn't want them to sell raw milk.

Q    Okay.  What do they mean by -- what do you understand pet to be, pet milk to be?

A    I don't know.  I have no idea what they had in their mind.

Q    Do you understanded pet milk to be for animals?

A    I don't know what they -- I don't know what -- I would have to say whoever decided that they have to put that on their label why, you know,

## CERTIFICATE OF OATH

STATE OF FLORIDA

COUNTY OF ESCAMBIA

I, the undersigned authority, certify that SHARON SCHAEFER personally appeared before me and was duly sworn.

WITNESS my hand and official seal this 8th day of May, 2015.

_____
ELAINE RICHBOURG

ELAINE RICHBOURG
MY COMMISSION # EE146436
EXPIRES March 06, 2016
(407) 398-0153   FloridaNotaryService.com

64

**REPORTER'S DEPOSITION CERTIFICATE**

I, ELAINE RICHBOURG, Court Reporter, certify that I was authorized to and did stenographically report the foregoing deposition of SHARON SCHAEFER; and that a review of the transcript was requested; and that the transcript is a true and complete record of my stenographic notes.

I further certify that I am not a relative, employee, attorney, or counsel of any of the parties, attorney or counsel connected with the action, nor am I financially interested in the action.

Dated this 8th day of May, 2015.

ELAINE RICHBOURG, COURT REPORTER

ELAINE RICHBOURG
MY COMMISSION # EE146436
EXPIRES March 06, 2016
(407) 398-0153          FloridaNotaryService.com

**QUART FRONT**

**QUART BACK**



# Ocheesee
# Creamery

"the hills shall
flow with milk"
Joel 3:18

## Pure
## Jersey Milk
## Products



*Est. 1989*



The Wesselhoefts are a
2nd and 3rd generation
farm family producing
milk from registered
Jersey cows in the
Florida panhandle.

*Ocheesee Creamery*
*Blountstown, Fla.*
*Permit # 12-8813*
*Ph # 850.674.1573*

*Return Clean*
*for Deposit*



EXHIBIT

2





UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION


CASE NO. 4:14-cv-00621-RH-CAS

OCHEESEE CREAMERY, LLC,,
          Plaintiff,
vs.
ADAM H. PUTNAM, in his
official capacity as Florida
Commissioner of Agriculture;
and GARY NEWTON, in his
official capacity as Chief of
the Florida Bureau of Dairy
Industry,
          Defendants.
_____


DEPOSITION OF:            LISA CONTI, Ph.D.


TAKEN AT INSTANCE OF:     The Plaintiff


DATE:                     May 13, 2015


TIME:                     Commenced at 9:00 a.m.
                          Concluded at 11:33 a.m.


LOCATION:                 2894 Remington Green Lane
                          Tallahassee, Florida


REPORTED BY:              SANDRA L. NARGIZ
                          Certified Realtime Reporter
                          Certificate of Merit Holder
                          snargiz@comcast.net

ACCURATE STENOTYPE REPORTERS, INC.
2894 REMINGTON GREEN LANE
TALLAHASSEE, FL  32308    850.878.2221
www.accuratestenotype.com

2

APPEARANCES:


         REPRESENTING PLAINTIFF:


         JUSTIN PEARSON, ESQUIRE
         jpearson@ij.org
         INSTITUTE FOR JUSTICE
         999 Brickell Avenue, #720
         Miami, FL   33131
         305.721.1600


         REPRESENTING DEFENDANTS:


         ASHLEY E. DAVIS, ESQUIRE
         ashley.davis@myfloridalegal.com
         DAVID GROSSMAN, ESQUIRE
         David.Grossman@myfloridalegal.com
         ATTORNEY GENERAL'S OFFICE
         107 W. Gaines Street
         Tallahassee, FL   32399
         -and-
         STEVEN HALL, ESQUIRE
         Steven.Hall@FreshFromFlorida.com
         DEPARTMENT OF AGRICULTURE AND CONSUMER SVS.
         407 South Calhoun Street, #520
         Tallahassee, FL   32399
         850.245.1000

15

A    So that would be Gary Miller -- I mean John Miller, I think you are going to be talking to, and then Gary Newton.  They can walk you through the exact steps. I've got the higher view.

Q    I understand.  In 2010, Ocheesee Creamery started selling skim milk.  And, Doctor, you mentioned that there was a stop-sale order.  Do you remember when that stop-sale order was?

A    That was after we had gotten lab work back that showed that the vitamin A and D content were insufficient to meet the identity for milk.

Q    When did you receive those lab results?

A    That was April 2012.

Q    Had you ever received similar lab results regarding Ocheesee Creamery skim milk in the past?

A    We had not.

Q    Why not?

A    My understanding is that when they initially were asking for their permit, that they were asked about the separation of the cream from the milk, and Ms. Wesselhoeft told Gary Newton that they would not sell it, that it was going to animal feed.  So it did not need to be tested if that was her plan.

Q    And when do you believe she said that?

A    At the time that she was asking for the

17

A    I have.

Q    And what is it?

A    This is the stop order.

Q    What's the date on it?

A    October 9, 2012.

Q    Now, did you say earlier that the test results that led to this were received by FDACS in April 2012?

A    I did.

Q    So why was there a delay?

A    Looking at the PMO, if you have a processor who is selling skim milk and the vitamins are not correct, then you try to work with that processor and find out why, determine the reason why there was no -- there is inadequate vitamins to meet the standard of identity.

Q    When you say PMO, what are you referring to?

A    The pasteurized milk ordinance, which is an FDA product.

Q    So the FDA writes the PMO?

A    The FDA in coordination with all 50 states. So it's actually quite an effort from a large group of people.  But the FDA and Health and Human Services is the entity that publishes the PMO.

Q    Are the states required to adopt the PMO?

A    All states have.

25

A    That, by law, she is required to put the vitamins back and she -- we would help her find a way to; if she needed help in figuring out how to do that, we would give her the assistance she would need.

Q    Now, when you say "by law," are you referring to the labeling requirement?

A    I am referring to the requirement to add vitamins back into -- for the standard of identity for skim milk.

Q    So just so we are clear, she could sell the same item that she had labeled as skim milk, she just could not call it skim milk, right?

A    Correct.

Q    And this was explained to her during the meetings?

A    No.  During this -- the last meeting, it was -- she was very vocal about not wanting to add vitamins back.  And so we left that meeting trying to think of, well, how could we help her?

Q    And what did you come up with?

A    We looked at the other statute.  Since her skim milk without vitamins doesn't meet the identity of milk, then we thought could we look at the imitation milk because it's an inferior product and, if so, how could we help her get there.  And she asked during that

meeting could I just call it mooshine and not call it skim milk.

Q    And what did you say?

A    From that meeting, we took it under advisement.  We then brainstormed about how we could make that happen.

Q    What was the result of that brainstorming?

A    The result was that Steven and I called her and her attorney and said that she could -- she could with some stipulations.

Q    What were those stipulations?

A    That was followed up in a letter, and so those stipulations were that the label would say nongrade A milk or nongrade A milk product, natural vitamins removed.

Q    When was the second to last meeting that you had with her, or conversation?

A    The second to last?

Q    I am sorry, I am going back in reverse chronology, which is perhaps not the clearest way to do it.  We just talked about the most recent conversation you had with Ms. Wesselhoeft.  Which was the conversation before that?

A    I am sorry, I did have -- I did have three meetings with her.  I am sorry about that.  Because I

27

met with her and Senator Montford as well.

Q     And when was that meeting?

A     That was earlier in the process, May 2013.

Q     And what was discussed during that meeting?

A     That was also discussed about what the law said and what she is required to do; and that right now, because the law requires the addition of vitamins and there is not an ability to sell anything other than grade A milk, that if they wanted to entertain changing the law, that that was an option for her.

Q     Are you aware of any time when Ocheesee Creamery marketed its skim milk as being grade A?

A     No.

Q     Are you aware of any time when Ocheesee Creamery skim milk has been sold across state lines?

A     There is an ongoing investigation.  I am not sure if that concerns skim milk.

Q     As we sit here today, are you aware of any instances when Ocheesee Creamery ever sold skim milk across state lines?

A     I am not aware.

Q     As we sit here today, are you aware of any instances when Ocheesee Creamery ever sold anything across state lines?

A     Yes.  There is an ongoing investigation into

34

BY MR. PEARSON:

Q    Dr. Conti, have you ever seen this document before?

A    I have.

Q    What is it?

A    This document is trying to help Ms. Wesselhoeft find a way to sell her skim milk that is not part of the identity of milk.  So it's looking at -- it's entertaining the permit for the imitation milk, and it sets out the requirements that we have for the imitation milk.

Q    So, about three-quarters of the way down, it says that it must include, the label must include the phrase "nongrade A milk product, natural milk vitamins removed."  Do you see that?

A    I do.

Q    I believe you referenced that language earlier in the deposition.

Where is that language from?

A    This is, again, doing -- trying to help her out since the sale of her milk is not allowed by Florida Statutes, by law.  So this is looking, entertaining another option for her.  So this was an attempt to provide consumers with the information that they would need to understand that this is a product that does not

34

BY MR. PEARSON:

Q    Dr. Conti, have you ever seen this document before?

A    I have.

Q    What is it?

A    This document is trying to help Ms. Wesselhoeft find a way to sell her skim milk that is not part of the identity of milk.  So it's looking at -- it's entertaining the permit for the imitation milk, and it sets out the requirements that we have for the imitation milk.

Q    So, about three-quarters of the way down, it says that it must include, the label must include the phrase "nongrade A milk product, natural milk vitamins removed."  Do you see that?

A    I do.

Q    I believe you referenced that language earlier in the deposition.

Where is that language from?

A    This is, again, doing -- trying to help her out since the sale of her milk is not allowed by Florida Statutes, by law.  So this is looking, entertaining another option for her.  So this was an attempt to provide consumers with the information that they would need to understand that this is a product that does not

35

meet the nutritional requirements of the standard of identity for milk.

Q    Was this language taken from anywhere?

A    This language was based on a number of hours of discussion with internal staff on how we could help consumers understand what they are purchasing.

Q    So if I understand you correctly, this language was created by FDACS, right?

A    This was to provide clarity on her label.

Q    Was it created by FDACS staff?

A    It was.

Q    Was it copied from any guidance materials?

A    No.  We are in uncharted territory.  No one has asked us before to sell substandard milk.

Q    Has it been used in discussions with anyone other than Ocheesee Creamery?

A    It has not.

Q    And Ocheesee Creamery refused to use this label, right?

A    Actually, no.  In communication with her prior attorney, in fact, in an e-mail that stated that they are giving you what you want, and a label was identified that used this and that was fine.  We thought we were coming to an agreeable conclusion at that point.

Q    And when was that correspondence?

A    That was just after this, in January, I believe.

Q    This is correspondence between Ms. Wesselhoeft and her attorney at the time?

A    Through FDACS and through her attorney and with her copied.

Q    But I am saying this was something that was said by --

A    They prevented -- after this letter -- I am sorry, go ahead.

Q    But this was a statement actually made by her attorney to her?

A    Yes.  She was copied.

Q    To your knowledge, has Ocheesee Creamery ever actually used this label?

A    No.  We were working with trying to finalize. So after this letter, she provided us or through her attorney provided us with a label, and so we had a few questions about it.

Q    So there was never actually a final agreement reached over whether to use this label, right?

A    Correct.  That's what we were working on with her.

Q    Any agreement that would be reached had to include this term "nongrade A milk, natural milk

37

vitamins removed" verbatim, right?

    A    Yes.

    Q    What is your understanding of what was
contained in the bottles labeled as skim milk by
Ocheesee Creamery?

    A    Say it one more time.  What was my
understanding about?

    Q    I mean, how was -- this skim milk that
Ocheesee Creamery had sold in the past, how was it
created, as far as you know?

        MS. DAVIS:  Objection to the form.
BY MR. PEARSON:

    Q    If you know.

    A    Well, she would pull the milk fats off and
separate it, and what was left over was the skim.  And
again, in 2007, when Gary [sic] Miller talked to her
about that, she indicated she had no -- she had not
intended on selling that, that it was going to be used
for feed, which is perfectly fine.  In fact, she could
sell it for feed and we talked to her about that.

    Q    Do you know whether the skim milk was
pasteurized?

    A    It is.  My understanding is it is.

    Q    What does pasteurization involve?

    A    It's a time temperature matrix in order to

53

BY MR. PEARSON:

Q    Doctor, have you ever seen this document before?

A    I have.

Q    What is it?

A    This is our letter responding to Ms. Wesselhoeft in trying to work to a resolution about the labeling.

Q    Was this written in response to the letter she sent on September 29th, 2014?

A    It was.

Q    Who signed this letter?

A    Mr. Newton.

Q    Did he discuss the language of the letter with you before he sent it?

A    Yes.

Q    And what did you two talk about?

A    Actually, this was a number of people from the Department who were involved, again, trying to weigh carefully how to move forward with this unusual request and getting -- again, trying to get some resolution.

So, it was looking at the labels that Ms. Wesselhoeft sent in addition to the original one, which was fine, and just further specified how to modify it so that there would be no consumer confusion.

54

Q    What modification did FDACS suggest to Ms. Wesselhoeft?

A    Added product after milk, nongrade A milk product, natural vitamins -- milk vitamins removed.  We also suggested she doesn't have to -- for the purposes of space, she did not have to have "the state requires us to call this" if she didn't want to.  That's up to her.

Q    Has there been any correspondence with Ocheesee Creamery after the date of this letter?

A    No.  We were waiting for her response.

Q    And just so we are clear, your suggestion -- I am sorry, the suggestion in this letter is to take the required language listed in the December 11, 2013, letter and supplement it with additional language but not change anything within the required language?  Does my question make sense?

MS. DAVIS:  Object to the form.  I think maybe she should be shown the letters, or we are just representing letters by their dates, not their content.  So that may be a -- present --

MR. PEARSON:  Not a problem.  Not a problem.  Oh, I'm sorry, Ms. Court Reporter, could you please hand Exhibit 2 back to the witness.

THE WITNESS:  Restate the question.

55

BY MR. PEARSON:

Q    I am just trying to make the record clear.  So in Exhibit 2, it says that the phrase, quote, nongrade A milk product, natural milk vitamins removed, end quote, is required, right?

A    Right.

Q    In the bolded language on Exhibit 7, that language from Exhibit 2 appears, right?

A    It does.

Q    But then in addition to that language there is additional language, right?

A    That was her suggestion.

Q    Right.  No, I understand.  I understand.  Just so the record is clear, she could have just done what was said in Exhibit 2 without this additional language in Exhibit 7, right?

A    Correct.  That's where we thought we were with her attorney, and so I'm not quite sure why she wanted to add the additional language.

Q    Right.  So, Ocheesee Creamery's options involved certain types of additional language to the language in Exhibit 2 but did not include removing or changing any of the language from Exhibit 2, right?

MS. DAVIS:  Objection, form.

56

BY MR. PEARSON:

Q     Do you understand what I am getting at?

A     Say again, please.

Q     Okay.  There are certain ways in which Ocheesee Creamery could have supplemented the language in Exhibit 2, right?

A     Right.

Q     One of those ways is listed in Exhibit 7, right?

A     Yes.

Q     But none of those ways include actually changing the language from Exhibit 2, right?

A     The original five suggestions did include changing what we said was required.

Q     Right.  But those were rejected, right?

A     Well, we entertained them and then we were trying to bring her back to what we had negotiated earlier.

Q     I understand what you are saying.  But they were rejected, weren't they?

MS. DAVIS:  Objection, misstates prior testimony.

BY MR. PEARSON:

Q     As they were written in --

MR. PEARSON:  You know what, Madam Court

Reporter, if you could add I believe it's Exhibit 3, the September 29th letter, back to the witness, please.

BY MR. PEARSON:

Q    So, Doctor, earlier we talked about these five alternatives in Exhibit 3.  Do you remember that?

A    I do.

Q    Okay.  The way they are written in this letter, did FDACS accept any of those five alternatives?

A    We looked at them and offered suggestions back to the wording in Exhibit 2 that we previously specified and that her attorney and she had previously indicated was okay.

Q    Thank you.  I am just trying to clarify the record.  Were any of these five alternatives in Exhibit 3 accepted by FDACS?

A    Based on these five, the fifth alternative had wording closest to what we had originally said that she needed to do.

Q    Okay.  But for the fifth alternative in the September 29, 2014, letter, it was not accepted as it was written in that letter, was it?

A    Exhibit 7 shows that we had brought her back to the original language.

Q    Right.  So that alternative five would have

58

had to be changed from how it was written in her letter in order to be acceptable, right?

A    Correct.

Q    Okay.  Is there any alternative label that Ocheesee Creamery could have proposed that would have been accepted by FDACS if it did not include the term, quote, nongrade A milk product, natural milk vitamins removed, end quote?

A    We stipulated that because we were concerned that consumers needed to know what was in it and that was the -- she did not want to use the term "imitation."

Q    I appreciate that.  I do need to ask certain questions, and so it helps if you answer the question I am asking.

So the record is clear, could Ocheesee Creamery have suggested an alternative label for its skim milk that would have been approved by FDACS if that label did not include the term "nongrade A milk product, natural milk vitamins removed"?

A    No.

Q    Thank you.  Does Florida have an individual definition for the term "skim milk"?

A    Other than what is in -- we've adopted the PMO, so the terms are related.

Q    Are you aware of any definition for the

59

specific term "skim milk" in the PMO?

A    Yes.

Q    Do you remember how the PMO defines skim milk?

A    The PMO includes CFR that requires the addition back of the vitamins that have been removed from skimming.

Q    In terms of the supplemental language -- perhaps it helps if I take a step back.  So there is a language in Exhibit 2, right, the required language: Nongrade A milk product, natural milk vitamins removed?

A    Right.

Q    And then there was correspondence about potential supplemental language that could be added to that language on the label, right?

A    Supplemental meaning?

Q    Like, for example, the phrase "The state requires us to call this," that's what I am referring to as supplemental language.

A    We'll entertain -- we were trying to work with her to get her to be able to sell their products, so we would entertain what she had to present to us.

Q    Okay.  Just so we are clear, I think I can phrase this in a different way.

Could -- or excuse me, would FDACS ever have approved a label for Ocheesee Creamery skim milk that

60

referred to the item being sold as skim milk in any way?

MS. DAVIS:  Objection to form.  It's outside her testimony what she could -- if FDACS could ever approve something.

THE WITNESS:  Our goal was to find something that if a customer picked it up, they knew that it was an inferior product.

BY MR. PEARSON:

Q    And by "inferior," you mean having less vitamins than a product that has vitamins added back in?

A    Correct.

Q    That's fine.  I am done with Exhibit 7.  You can hand all those exhibits back to the court reporter, ma'am.  Thank you.

MR. PEARSON:  Why don't we take a five-minute break, because based on kind of the answers, I may be able to amend what I am going to ask.  So let -- if you give me five minutes to kind of revise my questions, I might be able to speed things up.

MS. DAVIS:  That's fine.  Let's break for five.

(A recess took place from 10:35 a.m. to 10:44 a.m.)

MR. PEARSON:  Back on the record.

91

CERTIFICATE OF OATH

STATE OF FLORIDA          )

COUNTY OF LEON            )

I, the undersigned authority, certify that the above-named witness personally appeared before me and was duly sworn.

WITNESS my hand and official seal this 15th day of May, 2015.

SANDRA L. NARGIZ, RMR, CRR
1-800-934-9090
850-878-2221
snargiz@comcast.net

92

CERTIFICATE OF REPORTER

STATE OF FLORIDA     )

COUNTY OF LEON       )

I, SANDRA L. NARGIZ, Registered Professional Reporter, certify that the foregoing proceedings were taken before me at the time and place therein designated; that my shorthand notes were thereafter translated under my supervision; and the foregoing pages numbered 1 through 92 are a true and correct record of the aforesaid proceedings.

I further certify that I am not a relative, employee, attorney or counsel of any of the parties, nor am I a relative or employee of any of the parties' attorney or counsel connected with the action, nor am I financially interested in the action.

DATED this 15th day of May, 2015.

SANDRA L. NARGIZ, RMR, CRR
Notary Public
1-800-934-9090
850-878-2221
snargiz@comcast.net

01/06/2014   12:43   8506741573                                          PAGE   02/04



DIVISION OF FOOD SAFETY
BUREAU OF DAIRY INDUSTRY
(850) 245-5410
(850) 922-9444 FAX

THE CONNER BUILDING
3125 CONNER BOULEVARD
TALLAHASSEE, FLORIDA 32399-1650

# FLORIDA DEPARTMENT OF AGRICULTURE AND CONSUMER SERVICES
## COMMISSIONER ADAM H. PUTNAM

### CERTIFIED MAIL – RETURN RECEIPT REQUESTED

December 11, 2013

Mr. and Mrs. Paul Wesselhoeft
Ocheesee Creamery, LLC.
28367 NE SR 69
Grand Ridge, FL 32442

Dear Mr. and Mrs. Wesselhoeft:

Thank you for contacting the Department of Agriculture and Consumer Services regarding the possibility of obtaining an Imitation Milk and Milk Products Processor permit from the Department pursuant to Section 502.165, Florida Statutes. During a recent discussion with department staff, you acknowledged that during the processing of your skim milk product your company removes the natural vitamins with the milk fat and does not replace them to the levels required by the PMO. Your skim "milk" product is therefore nutritionally inferior to the federal standard of identity for "milk" making it less than Grade "A." Florida law provides that only Grade "A" pasteurized milk and milk products shall be sold at retail within the state.

You have indicated that you were requesting the Imitation Milk and Milk Products Processor permit to offer for sale this less than Grade "A" skim milk product as "MooShine" within the state. The department has determined that Florida law would allow your company to offer this product for retail sale within the state if the following conditions are met:

- Comply with the display and health standard requirements of s. 502.165, Florida Statutes
- The product label must include:
  - The phrase "Non-Grade "A" Milk Product, Natural Milk Vitamins Removed" in at least ½ the font size as the product title.
  - An ingredient statement that includes "skim milk" and any other ingredients if they are used (i.e. flavoring such as chocolate and/or sugar).
  - Container size by volume
  - The name and place of business of manufacturer, packer, or distributor must appear on the information panel or principal display panel.
- The product labeling shall not:
  - Make any nutrient or health claims
  - Include the term "Grade A."

EXHIBIT _2_
Witness _____
Date _5/13/15_
Reporter: Sandra Nargiz



1-800-HELPFLA                                            www.FreshFromFlorida.com

01/06/2014   12:43     8506741573                                                    PAGE   03/04

Mr. and Mrs. Paul Wesselhoeft
December 11, 2013
Page Two

If you wish to move forward with your request for an Imitation Milk and Milk Products
Processor permit, please submit an application and a proposed label for your "MooShine"
product to the department for review. The department will review the application and proposed
label and if it meets the requirements outlined above, the department will issue a permit to your
firm at which time you may commence bottling your product for retail sale.

Our goal is to insure high quality, healthy dairy products in Florida. We know that you share this
goal. Please contact your Dairy Specialist or our office if we can provide you with additional
assistance.

Sincerely,

Gary Newton, Chief
Bureau of Dairy Industry

GN/cdl

Enclosure

01/06/2014  12:43  8506741573                                          PAGE  04/04



**ADAM H. PUTNAM
COMMISSIONER**

### Florida Department of Agriculture and Consumer Services
### Division of Food Safety
### Bureau of Dairy Industry

### APPLICATION FOR PERMIT
### AS A MANUFACTURER OF MILK,
### MILK PRODUCTS, CHEESE OR CONTAINERS

Sections 502.053 and 502.165, Florida Statutes

Submit application to:

Florida Department of Agriculture and
Consumer Services
Bureau of Dairy Industry
3125 Conner Boulevard, Mail Stop C-27
Tallahassee, Florida 32399-1650
Dairy.Plants@FreshFromFlorida.com

(850) 245-5410 – Phone
(850) 922-9444 – FAX

Note: All documents and attachments submitted with this request are subject to public review pursuant to Chapter 119, F.S.

Pursuant to the requirements of Chapter 502, Florida Statutes, and Chapter 5D-1, Florida Administrative Code, I hereby make application for a state permit as:

### BUSINESS INFORMATION – CHECK TYPE OF BUSINESS

| | | | | | |
|---|---|---|---|---|---|
| Milk Plant Processor | ☐ | Manager/Milk & Milk Products Plant | ☐ | Single Service Container Manufacturer | ☐ |
| Washing Station | ☐ | Receiving Station | ☐ | Cheese Manufacturer | ☐ |
| Out of State Processor Of Milk and Milk Products** | ☐ | Transfer Station | ☐ | Imitation Milk Plant Processor | ☐ |

**Separate permit is required for each processing plant providing items for shipment into the State of Florida.

| | |
|---|---|
| Legal Name of Company or Individual: | |
| Trade Name or DBA: | |
| . . | |
| . . | . . |
| Type of Company (Sole Proprietorship, Corp., Partnership, etc): | |
| Street Address of Facility: | |
| City, County, State, Zip: | |
| IMS Identification Number or Plant Number if Applicable: | |
| Federal Employer Identification: | |
| Telephone Number/FAX Number: | |
| Web Site/E-Mail: | |
| Name of Contact Person: (Will receive Departmental Notices) | |
| Title of Contact Person: | |
| Mailing Address: | |
| City, County, State, Zip: | |
| Telephone Number/FAX Number: | |
| Email: | |

I hereby agree that all milk, milk products, ice cream, frozen desserts, imitation milk, imitation milk products and/or containers that I offer for sale, sell or barter, will be handled, processed and/or transported strictly in accordance with all provisions of Chapter 502, Florida Statutes, and Chapter 5D-1, Florida Administrative Code.

_____
Company Representative Signature

_____
Print Name

_____
Title

_____
Date

FDACS-05019 Rev. 11/13

September 29, 2014

Mr. Gary Newton
Florida Department of Agriculture and Consumer Services
Bureau of Dairy Industry
3125 Conner Boulevard, Mail Stop C-27
Tallahassee, Florida 32399-1650

Dear Mr. Newton:

As you know, we are the owners of Ocheesee Creamery, and we want to be able to start selling our pasteurized skim milk again. We were allowed to sell our skim milk for 3 years with no complaints, only compliments, on the quality of our skim milk. Your Department, The Bureau of Dairy Industry, has told us that in order to start selling it again we need to either inject it with Vitamin A, or label it like we are selling imitation milk. Our pasteurized skim milk is not imitation milk, and we will not inject anything into our skim milk, so we are submitting the label application you described in your December 11, 2013 letter.

We can agree with many of the requirements in your letter. We will list the ingredient of our pasteurized skim milk as skim milk (skim milk is the only ingredient in our pasteurized skim milk). We will also list the container size by volume and our name and place of business just like all of the other milk we sell at our creamery.

The problem is that you will not let us label our pasteurized skim milk as pasteurized skim milk and are forcing us to label it as Non-Grade "A" Milk Product, Natural Milk Vitamins Removed. The language you are requiring is confusing and wrong, so we have prepared some better alternatives:

Alternative #1

PASTEURIZED SKIM MILK
NO VITAMIN A ADDED

Alternative #2

PASTEURIZED SKIM MILK
NO LOST VITAMIN A REPLACED

Alternative #3

PASTEURIZED SKIM MILK
MOST VITAMIN A REMOVED
BY SKIMMING CREAM FROM MILK

EXHIBIT 3
Witness Conti
Date 5/13/15
Reporter: Sandra Nargiz

Alternative #4

NON-GRADE "A" SKIM MILK
SOME MILK VITAMINS REDUCED
BY SKIMMING CREAM FROM
ALL-NATURAL PASTEURIZED MILK

Alternative #5

THE STATE REQUIRES US TO CALL THIS:
"NON-GRADE 'A' MILK PRODUCT,
NATURAL MILK VITAMINS REMOVED."
IT IS ALL-NATURAL SKIM MILK
WITH SOME VITAMIN A REMOVED
BY SKIMMING CREAM FROM MILK


      Please let us know whether any of these alternatives are acceptable. Thank you for your consideration.


                                Sincerely,

Paul and Mary Lou Wesselhoeft
Ocheesee Creamery, LLC



DIVISION OF FOOD SAFETY
BUREAU OF DAIRY INDUSTRY
(850) 245-5410
(850) 922-9444 FAX

THE CONNER BUILDING
3125 CONNER BOULEVARD
TALLAHASSEE, FLORIDA 32399-1650

# FLORIDA DEPARTMENT OF AGRICULTURE AND CONSUMER SERVICES
## COMMISSIONER ADAM H. PUTNAM

October 23, 2014

Paul and Mary Lou Wesselhoeft
Ocheesee Creamery, LLC
28367 NE St. Rd. 69
Grand Ridge, FL 32442

Dear Mr. and Mrs. Wesselhoeft:

Thank you for your letter dated September 29, 2014, transmitting your Imitation Milk Plant Processor permit application. The purpose of this letter is to respond the questions included in your letter with the goal of finalizing the details necessary for the department to issue your permit.

As explained in the department's December 2013 letter, your skim "milk" product does not meet the federal standard of identity for "milk" because the natural vitamins are removed with the milk fat and are not replaced. Therefore, your skim "milk" product is not Grade "A" and Florida law provides that only Grade "A" pasteurized milk and milk products shall be sold at retail within the state.

The department's letter outlined the requirements for the issuance of a permit to authorize you to offer for sale non-Grade "A" skim milk product under the product name "MooShine." One of these requirements was that the wording "Non-Grade "A" Milk Product, Natural Milk Vitamins Removed" must be included in the product labeling.

In your September 29, 2014, letter you proposed several alternatives to the specific language the department provided. The department has reviewed your proposed alternatives and has concluded that your proposed Alternative #5 with a few modifications is acceptable. Therefore, the department proposes that the following language be included on the label:

**"The State requires us to call this: "Non-Grade "A" Milk Product, Natural Milk Vitamins Removed." All natural milk product with vitamins removed by separating cream from milk."**

The department believes that this language is the best compromise because it is a true statement that allows you to tell your customers that the product is an all natural milk product. The department realizes that statement may exceed the space available in your traditional labeling methods. Therefore, the department considers the "The State requires us to call this:" portion of the statement to be optional and that portion may be removed if you choose to do so. Further, as was explained in the department's

1-800-HELPFLA

**EXHIBIT** _7_

Witness _____
Date ___5/13/15___
Reporter: Sandra Nargiz

Fresh Florida.

www.FreshFromFlorida.com

original letter the statement must be printed in at least ½ the font size as the product title on your labeling.

If you wish to move forward with your request for an Imitation Milk and Milk Products Processor permit, please submit a proposed label for your "MooShine" product to the department for review. Also, please include a description for how the labeling will be displayed such as whether you will be using a collar tag or a sticker on the bottle. Finally, the department is aware that your company uses different color bottle caps to distinguish your products. Please include a description of the color of the bottle cap that you intend to use for this product and whether the name "MooShine" will be printed on it.

The department will review the proposed label and if it meets the requirements discussed above and in the original letter, the department will issue a permit to your firm at which time you may commence bottling your product for retail sale.

Our goal is to insure high quality, healthy dairy products in Florida. We know that you share this goal. Please contact your Dairy Specialist or our office if we can provide you with additional assistance.

Sincerely,

Gary Newton, Chief
Bureau of Dairy Industry

GN/cdl

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION


CASE NO. 4:14-cv-00621-RH-CAS

OCHEESEE CREAMERY, LLC,,
          Plaintiff,
vs.
ADAM H. PUTNAM, in his
official capacity as Florida
Commissioner of Agriculture;
and GARY NEWTON, in his
official capacity as Chief of
the Florida Bureau of Dairy
Industry,
          Defendants.
_____


DEPOSITION OF:            THOMAS GARY NEWTON


TAKEN AT INSTANCE OF:     The Plaintiff



DATE:                     May 13, 2015


TIME:                     Commenced at 2:00 p.m.
                          Concluded at 3:41 p.m.


LOCATION:                 2894 Remington Green Lane
                          Tallahassee, Florida


REPORTED BY:              SANDRA L. NARGIZ
                          Certified Realtime Reporter
                          Certificate of Merit Holder
                          snargiz@comcast.net

ACCURATE STENOTYPE REPORTERS, INC.
2894 REMINGTON GREEN LANE
TALLAHASSEE, FL  32308    850.878.2221
www.accuratestenotype.com

2

APPEARANCES:


        REPRESENTING PLAINTIFF:


        JUSTIN PEARSON, ESQUIRE
        jpearson@ij.org
        INSTITUTE FOR JUSTICE
        999 Brickell Avenue, #720
        Miami, FL   33131
        305.721.1600


        REPRESENTING DEFENDANTS:


        ASHLEY E. DAVIS, ESQUIRE
        ashley.davis@myfloridalegal.com
        DAVID GROSSMAN, ESQUIRE
        David.Grossman@myfloridalegal.com
        ATTORNEY GENERAL'S OFFICE
        107 W. Gaines Street
        Tallahassee, FL   32399
        -and-
        STEVEN HALL, ESQUIRE
        Steven.Hall@FreshFromFlorida.com
        DEPARTMENT OF AGRICULTURE AND CONSUMER SVS.
        407 South Calhoun Street, #520
        Tallahassee, FL   32399
        850.245.1000

3

INDEX

WITNESS                                              PAGE

THOMAS GARY NEWTON.                                    4

    Direct Examination by Mr. Pearson                 4


                    INDEX OF EXHIBITS

          (Exhibits are attached to transcript.)

NO.          DESCRIPTION                             ID

Exhibit 8  E-mail from Newton to Conti            21
Exhibit 9  E-mail from Newton to Cornman          44
Exhibit 10  E-mail from Newton to Mardenborough 51

CERTIFICATE OF OATH                                  54
CERTIFICATE OF REPORTER                              55
ERRATA SHEET                                         56

Q    All right.  Mr. Newton, do you remember -- well, let me go back to basics.  On page 2 of Exhibit 3, who signed this letter?

A    I did.

Q    And on page 1, what's the date on the letter?

A    December the 11th.

Q    What year?

A    2013.

Q    Do you remember sending this letter?

A    Yes, I do.

Q    Do you remember why it was sent?

A    It was sent to provide -- to accommodate Ocheesee Creamery and other label options.

Q    So before this letter was sent, what options did Ocheesee Creamery have?

A    To add vitamins to their milk so they could call it skim milk.

Q    And then what additional options did this letter provide?

        MS. DAVIS:  Objection.  The letter speaks for itself.

        THE WITNESS:  Yes.

BY MR. PEARSON:

Q    What additional options were you attempting to provide when you sent the letter?

32

A    We were trying to identify ways that the product could be labeled accurately, that from skim milk where vitamins are added back and where Ocheesee Creamery did not want to add vitamins, so we were trying to come up with options to accommodate them.

Q    If you go down three-quarters of the way, do you see where it says nongrade A milk products, natural milk vitamins removed?

A    Uh-huh.

Q    Where did that term come from?

MS. DAVIS:  Objection.  You can answer if you have knowledge of that.

THE WITNESS:  That term came through discussions between various people in our organization, as a possible option.

BY MR. PEARSON:

Q    Was it taken from anything, like --

A    No.

Q    No one had ever seen it before?

A    No.

Q    The next bullet point down, do you see where it says an ingredient statement that includes skim milk and the other ingredients?

A    Yes.

Q    Okay.  Is it your understanding that skim milk

35

A   A nutritional labeling exemption is given by the Food and Drug Administration, and it is based on the number of employees you have.  It's basically for small businesses.  And I think they may include the annual production on there, but I can't remember exactly what the full qualifications are from there.

But I did help them get that.  I did accommodate them in getting that.  And as far as the -- include the term grade A, since Ocheesee Creamery did not want to add vitamins to their milk, therefore it was our opinion that it could not be a grade A product.

Q   Okay.  I want to talk about a couple of things you just mentioned.

A   Okay.

Q   You said that you helped Ocheesee Creamery obtain that exemption from the FDA?

A   Yes.  We provided the information to them as to where to go to do that.

Q   Is it your understanding that they successfully received that exemption?

A   Yes.

Q   So is it your understanding that they -- that Ocheesee Creamery is exempt from the FDA food labeling requirements?

A   Nutritional labeling requirement.

54

CERTIFICATE OF OATH

STATE OF FLORIDA            )

COUNTY OF LEON              )

I, the undersigned authority, certify that the above-named witness personally appeared before me and was duly sworn.

WITNESS my hand and official seal this 15th day of May, 2015.

SANDRA L. NARGIZ, RMR, CRR
1-800-934-9090
850-878-2221
snargiz@comcast.net

55

CERTIFICATE OF REPORTER

STATE OF FLORIDA        )

COUNTY OF LEON          )

          I, SANDRA L. NARGIZ, Registered Professional Reporter, certify that the foregoing proceedings were taken before me at the time and place therein designated; that my shorthand notes were thereafter translated under my supervision; and the foregoing pages numbered 1 through 55 are a true and correct record of the aforesaid proceedings.

          I further certify that I am not a relative, employee, attorney or counsel of any of the parties, nor am I a relative or employee of any of the parties' attorney or counsel connected with the action, nor am I financially interested in the action.

          DATED this 15th day of May, 2015.


                              SANDRA L. NARGIZ, RMR, CRR
                              Notary Public
                              1-800-934-9090
                              850-878-2221
                              snargiz@comcast.net